**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The HORN & HARDART COMPANY, Respondent.**

**No. 191, Docket 34714.**

United States Court of Appeals, Second Circuit.

Argued Nov. 11, 1970.

Decided Feb. 1, 1971.

■■■■■■■■■■

Michael Barkow, Atty. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul J. Spielberg, Atty., on the brief), for N. L. R. B.

Robert E. Wachs, Philadelphia, Pa. (Richard S. Meyer, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., on the brief), for respondent.

Before SMITH and FEINBERG, Circuit Judges, and LEVET, District Judge.*

FEINBERG, Circuit Judge:

The National Labor Relations Board asks us to enforce its order requiring respondent The Horn & Hardart Company to bargain with the Restaurant Cashiers Association as representative of the Company's cashiers. The issues before us all grow out of the Board's refusal to defer to an arbitration award which found that the cashiers were part of an overall unit already represented by another union, Cafeteria Employees Union, Local 302, AFL–CIO. For reasons set forth below, we hold that the Board's action was correct, and we enforce its order.

I.

The cashiers in question work at the Company's chain of restaurants in the New York City Metropolitan area. There are three types of restaurants: waitress-service, cafeteria, and automat-cafeteria. In each, money is handled in a slightly different way and the duties of employees vary accordingly. In the waitress-service restaurants, customers receive a check from the waitress and pay a cashier who makes change from a cash register. In the cafeterias, "checkers" at the end of the food line add up the customers' bills, receive payment, and give change from a cash register. In the automat portion of the automat-cafeterias, employees (who are also called "cashiers") make change for use in the vending machines; in the cafeteria portion, "checkers" operate as described above.

Each type of restaurant has a "head cashier" who receives money taken in by the restaurant, makes up the "bank" (the amount of cash given to each cashier or checker at the start of the day), and prepares the payroll once a week. Head cashiers alone of rank-and-file employees have the combination to the restaurant safe. Head cashiers and relief head cashiers comprise slightly over half of the certified unit involved here; the other employees are called "assistant cashiers," "relief cashiers," or "P. M. cashiers." The distinctive administrative duties of the head cashiers occupy two or three hours of their time each day. During the balance of their shift, the head cashiers' duties vary depending upon the type of restaurant. In the waitress-service restaurants, there are typically no assistant cashiers, and the head cashiers perform the cashiers' regular duties at the cash register in addition to their distinctive duties as head cashiers. In the cafeterias, the head cashiers relieve the checkers. In the automat-cafeterias, the head cashiers either serve as money changers or relieve the assistant cashiers. Checkers and

* Of the Southern District of New York, sitting by designation.

other personnel relieve the cashiers in automat-cafeterias and waitress-service restaurants, but do not perform any of the distinctive duties of head cashier when doing so. Cashiers and checkers have the same workweek, vacations, holidays, leave policy, meal entitlement and supervision. All cashiers are salaried employees, however, while checkers are hourly-paid.

For many years, Local 302 has been trying to organize the Company's New York restaurants. Its efforts included four representation elections, two conducted by the New York State Labor Relations Board and two by the National Labor Relations Board. In each election, checkers were included in the units, but head and other cashiers were not. Although unsuccessful in these elections, Local 302 persisted. Finally, in March 1966, Local 302 and the Company entered into a three-year collective bargaining agreement. The contract unit expressly includes "full time and regular part-time employees" at the Company's restaurants, including "retail food employees, checkers, head busses and hostesses." However, "cashiers" are expressly excluded from the unit. The contract lists wage rates for various classifications, including the "checkers," but contains no rates for any salaried personnel.

In March 1968, Local 302 informed the Company that the exclusion of "cashiers" had been inadvertent, and that they should be included in the unit. The Company rejected this claim. By letter dated April 8, the dispute was submitted to Dr. Maurice S. Trotta, the permanent arbitrator under the collective bargaining agreement. The next day, the Company's Director of Personnel sent a notice through the mail to the managers of the various restaurants, informing the cashiers of the Local 302 demand and the arbitration. However, the notice did not mention when the hearing would take place.

The arbitration was actually held two days later on April 11, and lasted 2½ hours. At the hearing, the parties stated their positions and were questioned by the arbitrator. There was no sworn testimony and the principal written evidence was a copy of the contract between Local 302 and the Company. No cashiers were present, nor were they represented. On April 15, the Restaurant Cashiers Association wrote the Company that it represented a majority of the cashiers and asked to be recognized as bargaining representative. The letter also stated that the Association had filed a petition for certification with the National Labor Relations Board. On April 16, the Company sent a copy of the letter to the arbitrator. One week later, he issued his award, holding that "The job classifications Head Cashier and Cashier were not intended by the parties to be excluded from the bargaining unit."

Thereafter, proceedings commenced before the National Labor Relations Board on the Association's representation petition. The Company and Local 302 took the position that the cashiers belonged in the larger unit and urged dismissal of the petition on a number of grounds. The Board found that the cashiers constituted a "residual unit which may be appropriate for separate representation," but that an overall unit including the cashiers could also be appropriate if the cashiers preferred representation by Local 302 in the larger unit. Accordingly, the Board directed an election in which the cashiers were offered the alternatives of being represented by the Association, by Local 302, or by no bargaining agent at all. At the election in January 1969, 57 cashiers voted for the Association, and 45 voted against representation. Not a single employee voted for Local 302. Thereafter, when the Company refused to bargain with the Association upon its demand, the Association filed an unfair labor practice charge. Eventually, the Board granted the General Counsel's motion for summary judgment, found that the Company had violated sections 8(a) (5) and (1) of the Act by refusing to bargain with the Association, and or-

dered the Company to do so. That order is the subject of this proceeding.

## II.

The Company offers a number of reasons why the Board's order should not be enforced. It claims that the Board should have deferred to the arbitrator's decision, that the Board abused its discretion in finding that the cashiers constituted a residual unit and in rejecting the Company's claim that the cashiers were an "accretion" to the current unit, and that, in any event, the Board should not have granted summary judgment. Both parties properly regard the first of these contentions as the most substantial, and to it we turn.

■ The Company argues that the Board has established rules as to when it will defer to an arbitration award, but in this case failed to follow them. The assertion that the Board must defer to an arbitrator in a particular case is startling at first blush, since the National Labor Relations Act, 29 U.S.C. § 160(a) provides:

> The Board is empowered * * * to prevent any person from engaging in any unfair labor practice * * *. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *.

The Company directs our attention to the familiar Steelworkers Trilogy,[1] which emphasizes the expertise of arbitrators and heaps lavish praise upon the arbitration process. We are familiar with those cases—indeed, we doubt if there is a federal judge who is not—and we have fully accepted their implications in the past. E.g., International Longshoremen's Association v. New York Shipping Association, 403 F.2d 807 (2d Cir. 1968). But the Supreme Court itself, quoting the statutory language above, has pointed out that "the relationship of the Board to the arbitration process is of a quite different order" from "the relationship of courts to arbitrators when an arbitration award is under review." NLRB v. Acme Industrial Co., 385 U.S. 432, 436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). It is quite clear from the cases that in absolute terms the Board is not "automatically" required "to defer to the primary determination of an arbitrator." Id. at 437, 87 S.Ct. at 568; Carey v. Westinghouse Electric Corp., 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964) ("Should the Board disagree with the arbiter * * * the Board's ruling would, of course, take precedence * * *."); Lodge 743, IAM v. United Aircraft Corp., 337 F.2d 5 (2d Cir. 1964), cert. denied, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965). Nor is this surprising. The National Labor Relations Act guarantees certain rights to employees, employers, bargaining representatives, and the public, and the Board is charged with protecting these interests. An arbitrator is not. His function is to discern the intention of the parties to a contract, who have hired him to resolve their differences. The interests of third parties, such as an individual employee, a group of employees or the public, are not his primary concern.

■ On the other hand, voluntary settlement of labor disputes is in the national interest; indeed, the Act so states.[2] Moreover, the Court has talked so glowingly of "the therapy of arbitration * * * in a complicated and troubled area," Carey v. Westinghouse Electric Corp., supra, 375 U.S. at 272, 84 S.Ct. at 409, that it is not surprising that the Board has dealt with the interplay between its proceedings and arbitration by giving considerable weight to

---

1. United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

2. 29 U.S.C. § 173(d).

the latter. But it is worth remembering that the Board's rules on deference, after all, are self-imposed although it has followed healthy hints from the Supreme Court. Nevertheless, so far as we know, in no case has the Court directed the Board to defer to an arbitration award, but cf. NLRB v. Auburn Rubber Co., 384 F.2d 1 (10th Cir. 1967), so that its discretion in this respect must be regarded as large. We do not suggest that the Board can announce a policy regarding deference to arbitration and then blithely ignore it, thereby leading astray litigants who depended upon it. But it can change its mind or alter its standards for deference in some respects without necessarily engaging in conduct so blameworthy as to justify our calling it abuse of discretion.

The Company claims that in this case there was such an abuse. To resolve that question, we must look first to the Board's rules on deference and then to what it did here. The Board's criteria have emerged in a series of cases. In 1955, the Board stated in Spielberg Manufacturing Co., 112 N.L.R.B. 1080, 1082, that it would not consider an arbitration award on its merits if "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purpose and policies of the Act." In International Harvester Co., 138 N.L.R.B. 923, 927 (1962), enforced sub nom. Ramsey v. NLRB, 327 F.2d 784 (7th Cir. 1964), the Board varied the language of the test a little: It would not adjudicate an unfair labor practice claim which arose from the same facts as an arbitrated dispute "unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act." In Raley's Supermarkets, 143 N.L.R.B. 256 (1963), relied on heavily by respondent here, the Board applied this test to an unfair labor practice proceeding in which two unions contended for the right to represent a small group of employees; the Board deferred to an arbitration award that held that the employees were part of an already existing overall unit. Since then, however, the Board has retreated somewhat from its readiness to defer. In Hotel Employers Association of San Francisco, 159 N.L.R.B. 143, 147–49 (1966), and Pullman Industries, Inc., 159 N.L.R.B. 580 (1966), the Board refused to defer to an arbitrator's award that a collective bargaining agreement covered disputed employees whom another union claimed to represent. And in Westinghouse Electric Corp., 162 N.L.R.B. 768, 771 (1967), the Board again refused to defer to an arbitration award, noting that it had already "limited the scope of Raley's" and that

> the ultimate issue of representation could not be decided by the Arbitrator on the basis of his interpreting the contract under which he was authorized to act, but could only be resolved by utilization of Board criteria for making unit determinations. In such cases the arbitrator's award must clearly reflect the use of and be consonant with Board standards.

Indeed, according to an exhaustive analysis of Board cases in which deference to an arbitrator's award was possible: In the period from 1965–1967, the Board did not defer once in a bargaining unit and representation case, although it was asked to do so five times; this contrasted sharply with the preceding four years when the Board deferred in about half of some 60-odd cases of this type. See Note, The NLRB and Deference to Arbitration, 77 Yale L.J. 1191, 1219–21 (1968).

■ Against this background of the development of Board policy on this issue, we turn to its refusal to defer in this case. In ordering an election, the Board rejected the contention that Raley's required it to defer to the arbitrator's award:

> In Raley's the Board based its decision, in part, on a finding that, al-

though the Petitioner was not represented at the arbitration hearing, its position was identical with that of the Employer and the Employer "vigorously" asserted its position in the arbitration proceeding. As in *Raley's* the Petitioner herein did not participate in the arbitration proceeding and as in *Raley's* the Employer in the instant case asserted a position in the arbitration proceeding which is identical with the Petitioner's position herein, namely that the present contract does not cover cashiers. The record is unclear as to how vigorously the Employer asserted this position.[12] How-

12. Employer, in its brief, states: "A finding that the cashiers comprise an appropriate unit would be devastating. In view of Local 302's unwillingness to allow interchange of unit personnel and cashiers, the company would be obligated to hire additional employees to relieve the cashiers and checkers."

"Interchange of unit personnel with cashiers is an integral part of the company's operation. Abolition of this practice would punish the company unnecessarily."

The Employer was apparently aware of this problem at the time of the arbitration proceeding as the arbitrator notes that, if its head cashiers are excluded from the unit, they will not be permitted to substitute for checkers. Where, as here, the Employer regards itself as potentially "punish[ed]" if the position it urged in arbitration hearing is adopted, it would be difficult to find that Petitioner's position was vigorously asserted at the arbitration hearing.

ever, it is clear from the testimony at the hearing and from a reading of the arbitration award that not all of the pertinent evidence was made available to the arbitrator. The two primary deficiencies are the failure to provide the arbitrator with information concerning the long history of Intervenor's attempts to organize the Employer and the consistent exclusion of cashiers from these attempts, and the failure to provide him with a clear understanding of the duties of the employees in question. In these circumstances, we do not think it would effectuate statutory policy to defer to the arbitration award. [Remaining footnotes omitted.]

Respondent claims that contrary to the Board's innuendo, the Company did vigorously assert its position before the arbitrator, and that, in any event, the arbitration hearing did satisfy all of the Board's standards for deference.

The Board's basic reason for refusing to defer to the arbitrator was that the position of the cashiers was not adequately presented to him. We see no reason to disagree with that conclusion, much less to regard it as an abuse of discretion. The past consistent exclusion of cashiers from the unit that Local 302 sought to represent was immensely important. The arbitrator's failure even to mention this history in his opinion justified the Board's inference that he was not fully aware of it. Similarly, the Board's concern over the vigor with which the Company pressed the cashiers' position was not unjustified. The Company, after all, was in a difficult situation. Local 302 had indicated its intention to stop interchange of unit personnel and cashiers unless the latter were included in the unit. Thus, success in the arbitration would probably cause the Company substantial additional expense. In that position, the Company's fervor to win the arbitration might be less than passionate. By pointing this out, the Board did not charge bad faith or indulge in snide innuendo, as the Company seems to feel. It merely recognized a fact of life. The Company argues that if it had secretly wanted to accede to the demands of Local 302 it could have done so without any arbitration at all. But if the Company had done that, it might well have committed an unfair labor practice under recognized authority.[3] The question before the Board in this context was not wheth-

3. Food Employers Council, Inc., 163 N.L.R.B. 426, 428–29 (1967), enforced, 399 F.2d 501 (9th Cir. 1969); NLRB v. Masters-Lake Success, Inc., 287 F.2d 35 (2d Cir. 1961).

er the Company was plotting with Local 302—no one suggests that—but whether the cashiers' interests were so insufficiently represented that the Board should properly conclude, even under *Raley's*, that the hearing was not fair and free from any procedural infirmity. Moreover, the Board could look to later cases, as it did,[4] to conclude that to justify deference the award had to be responsive to established representation policies. The crucial issue before the Board was how the interests of the cashiers would be best served, e.g., by a separate unit, by inclusion in an overall unit, or by an election presenting those possibilities. The Board's desire to maximize freedom of choice was based upon a statutory policy, which the arbitrator did not have to—and apparently did not—take into account. All in all, we see no basis for reversing the Board's conclusion that it should not defer to the arbitration award.

### III.

Putting the arbitration award to one side, the Company alternatively argues that the Board erred in three other respects. The Company's first contention is that the Board incorrectly found that the cashiers constituted a "residual unit," the representation of which should be decided by election.

The Board's "residual unit" policy is invoked where the bulk of the employees in a plant or department are already represented by one union and another union then seeks to represent the remaining employees. The Board's determination that such employees constitute a residual unit is a shorthand for stating that they are entitled to separate representation if they so desire.

The controversy in the present case arises over the number of situations in which the Board may justifiably find a residual unit. The parties agree that a residual unit is correctly found when the incumbent union continues to have no interest in representing the excluded employees, so that those employees "must either properly constitute a separate bargaining unit or be indefinitely denied the right of collective bargaining until such time as a labor organization desires to represent them as part of a larger unit." Detroit Incinerator Co., 45 N.L.R.B. 414, 417 (1942). Respondent contends that this is the only situation which justifies a finding of a residual unit. In contrast, the Board states that "the unwillingness of an incumbent representative to add residual employees to an existing unit is not a prerequisite to finding a residual unit appropriate." Pennsalt Chemicals Corp., 119 N.L.R.B. 128, 129 (1957). Rather, the Board argues, it suffices that the residual unit include the balance of unrepresented employees who have historically been excluded from the existing unit. The Board then cites its practice of directing self-determination elections in such situations when an overall unit would be appropriate and the incumbent union indicates its willingness to add the residual employees to the existing unit. E.g., *Id.;* Sealtest, Ohio Division of National Dairy Products Corp., 117 N.L.R.B. 1628, 1629–30 (1957).

The Board's decision to apply this policy to the present case seems eminently reasonable, for the record provides a sufficient basis for either including the cashiers in the unit represented by Local 302 or placing them in a separate unit. As to similarities with Local 302 members, not only are cashiers subject to the same workweek, holidays, funeral leave, meal entitlement and supervisors as employees represented by the incumbent union, but many spend three-quarters of their working day performing the tasks of checkers. Yet there are significant reasons for separate representation: Cashiers are salaried while checkers are hourly paid, and cashiers have systematically been excluded from the overall unit in Local 302's past organizational

---

4. The Board cited Westinghouse Elec. Corp., 162 N.L.R.B. 768 (1967), and Hotel Employers Ass'n, 159 N.L.R.B. 143 (1966).

campaigns; in addition, only head cashiers, comprising over half of the group, make up the bank and are the sole non-supervisory employees with the combination to the restaurant safe.

In light of the conflicting viable alternatives, the Board's decision to designate the cashiers a residual unit and order a self-determination election appears fully consonant with the statutory command that the Board's unit determination should aim "to assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S. C. § 159. Mindful that the Board's expertise is sufficiently compelling in the area of unit determination that its exercise will not be disturbed unless arbitrary or capricious, Wheeler-Van Label Co. v. NLRB, 408 F.2d 613, 616 (2d Cir.), cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969), we affirm its decision that the cashiers constituted a residual unit.

■ Similarly, we find no absue of discretion in the Board's rejection of respondent's claim that the cashiers constituted an "accretion" to the group represented by Local 302, which should have been added to that unit without an election. The accretion doctrine ordinarily applies to new employees (or old employees with new jobs) who have common interests with members of the existing unit and might properly have been covered by the current contract. E.g., Simmons Co., 126 N.L.R.B. 656

(1960). The Board is cautious in making this designation because, in contrast to the residual unit doctrine, it denies the new employees the right to express their wishes in an election. Accordingly, the Board's policy is to find no accretion where the group in question had a separate and distinct existence at the time the represented group's contract was executed and there is no evidence that the contract was intended to cover them. See, e.g., Westinghouse Electric Corp., 162 N.L.R.B. 768, 770–75 (1967). In the present case, the cashiers existed as a distinct group with essentially the same duties long before the recognition of Local 302. Likewise, Local 302 had systematically excluded the cashiers from every one of its organizational drives. On these facts, the Board was justified in declining to find that the cashiers constituted an accretion to the unit represented by Local 302.[5]

Finally, the Company argues that the Board improperly granted General Counsel's motion for summary judgment at the unfair labor practice hearing. Respondent contends that it should have been allowed to proffer evidence at the hearing that (1) the arbitrator was given all pertinent information relative to prior bargaining history and exclusion of cashiers and (2) the unions proposed to disallow interchange between cashiers and other employees, a position which would have caused great financial harm to the Company.

5. The cases cited in respondent's brief are inapposite. In Horn & Hardart, 170 N.L.R.B. No. 110 (1968), the Teamsters endeavored to represent employees at the Company's Cross-County restaurant, in spite of the fact that Local 302 represented the analogous employees at the Company's other restaurants. The Board rejected the Teamsters' petition, reasoning that the geographic proximity of the restaurants, the high degree of integration and centralization of the chain's operations, the significant degree of employee interchange, and Local 302's desire to represent the employees in a chain-wide unit all militated against a separate unit for the single restaurant. The Board did note that Local 302 claimed to represent a chain-wide unit. Contrary to respondent's assertion here, however, the Board did not validate Local 302's claim by finding that the Cross-County employees constituted an accretion. In Radio Corp. of America, 141 N.L.R.B. 1134, 1137 (1963), the Board found an accretion because the employees in question were not present when the certified unit was established, they had a close community of interest with members of that unit, and they "would have been included as part of such unit" if their classification had been in existence at the time of the certification.

■ It is well established that the Board will not permit litigation at an unfair labor practice proceeding of matters which were, or could have been, litigated in the underlying representation proceeding. Thus, the objecting party can only submit evidence if it shows that the evidence is newly discovered or previously unavailable, NLRB v. Union Brothers Inc., 403 F.2d 883, 887 (4th Cir. 1968).

■ The Company argues, in effect, that evidence that the arbitrator was advised of the previous bargaining history comes within these exceptions because the Board retroactively decided that the Company had to recreate the arbitration record in its entirety at the representation hearing, although respondent had duly offered the evidence required by *Raley's* and *Spielberg*. This challenge merits relatively little consideration for, as discussed above, several later Board cases showed the increased stringency regarding deference to arbitration awards. Respondent should have been aware that the failure to show the arbitrator's knowledge of prior bargaining history might be considered important by the Board in evaluating the weight to be given to the arbitration award. Accordingly, the Company cannot claim unfair surprise as a basis for introducing testimony on this issue.

■ Respondent's other "previously unavailable" evidence relates to the possibility that the Board's decision in the representation hearing might terminate intercharge between cashiers and employees represented by Local 302, thereby causing great financial hardship to the Company. The Company contends that this possibility had only tentatively been raised at the time of the representation hearing and that it did not become fully cognizant of the extent of the problem until after the hearing, when both unions indicated their unwillingness to allow interchange. Admittedly, respondent may suffer financial hardship because of the cashiers' choice of

representative. Nevertheless, the record does not show that the evidence as to interchange was "previously unavailable." In fact, the Board's opinion directing an election makes clear that the argument was made to it and considered.[6] Accordingly, we find that the Board did not err in granting summary judgment in the subsequent unfair labor practice proceeding.

Enforcement granted.