**GENERAL MARINE TRANSPORT CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Marine Division Local 333 I.L.A., A.F.L.–C.I.O., Intervenor.**

**No. 1186, 1304, Dockets 79–4035, 79–4074.**

United States Court of Appeals, Second Circuit.

Argued June 13, 1979.

Decided March 26, 1980.

---

15. For the reasons requiring this cumbersome method of disposition, see *Shapiro v. Ferandina, supra*, 478 F.2d at 914.

Kevin J. McGill, New York City (Clifton, Budd, Burke & DeMaria, P.C.), Jared Stamell, New York City, for petitioner.

Janet C. McCaa, Michael Murchison, N. L. R. B., Washington, D.C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Washington, D.C.), for respondent.

Seymour Waldman, New York City (Waldman & Waldman, P.C., New York City), for intervenor.

Before MANSFIELD and MULLIGAN, Circuit Judges, and GAGLIARDI, District Judge.*

GAGLIARDI, District Judge:

General Marine Transport Corp. ("General Marine") petitions this court pursuant to Section 10(f) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 160(f), to review and set aside an order of the National Labor Relations Board entered on September 29, 1978 which adopted the recommendation of Administrative Law Judge David S. Davidson. The Board ruled that General Marine had engaged in unfair labor practices by repudiating a multi-employer association contract and by making unilateral changes in wages, hours and other terms and conditions of employment in violation of Section 8(a)(5) and (1) of the Act, 28 U.S.C. § 158(a)(5) and (1). The Board cross-petitions for enforcement of its order. Because we find that the complaint from which this enforcement proceeding arises is time-barred by virtue of section 10(b) of the Act, 29 U.S.C. § 160(b), the petition for review is granted, the order set aside, and the cross-application for enforcement denied.

### Statement of Facts

A somewhat detailed review of the dispute between General Marine and the intervenor in this proceeding, United Marine Division Local 333 I.L.A., A.F.L.–C.I.O. ("Local 333"), is necessary for an understanding of the issues, particularly the statute of limitations issue, raised in this case.

---

* The Honorable Lee P. Gagliardi, United States District Judge for the Southern District of New York, sitting by designation.

General Marine, a wholly-owned subsidiary of a holding company owned and operated by the Berman Family, operates sludge vessels used to transport and dispose of sewage sludge. Sometime prior to 1973, General Marine recognized Local 333 as the collective bargaining representative of its employees and joined the New York Marine Towing and Transportation Association ("the Association"), a multiemployer association which negotiates contracts on behalf of its members with the union. In 1969, General Marine agreed that all Association contracts listing it as a member would apply to employees working five vessels—the Susan Frank, the Sam Berman, the Samantha, the Richard K, and the Jonathan B (hereinafter "the 1969 letter of understanding"). On April 1, 1973, the Association, on behalf of owners of towing and transportation vessels, including General Marine, entered into a three year contract with Local 333. Article I Section I of the agreement limited its scope "to licensed and unlicensed employees, employed on tugboats and self-propelled lighters owned or operated by the [covered employers] in the Port of New York and vicinity."

Shortly before the expiration of the 1973–76 contract, the Association requested General Marine to complete an authorization form so that the Association could negotiate a new contract on its behalf. The president of General Marine signed the form and, in response to a request for the "number and type of vessels that your company . . . now owns or operates which are subject to the union agreements," the president listed one vessel—the Susan Frank. On March 26, 1976, the Association and Local 333 executed a new three year contract which, with the exception of two provisions, renewed the 1973–76 agreement. These two changes were as follows. First, the new agreement covered not only all employees working on vessels owned or operated by member employers, but also all

employees of "a subsidiary company, an affiliated company or a company division in the Port of New York and vicinity." Second, the new agreement contained the so-called vegetable oil clause which stated that:

> [n]o vessel operated under this contract shall tow any barge under 55,000 barrels used in the animal, vegetable, or fish oil trades unless there are two men aboard the barge at all times.

Based upon this agreement, Local 333 claimed that Berman Enterprises, Inc. ("Berman"), a corporation which operates tugs, barges, and tankers in the New York harbor and which, like General Marine, is a wholly-owned subsidiary of the Berman family holding company, was required to abide by the contract between the Association and the union. On April 13, 1976, Peter Frank, Vice President of General Marine, sent a letter to Local 333 which stated, in pertinent part:

> We have studied [the agreement] and find that its scope exceeds the authority of the Association to negotiate on behalf of General Marine Transport Corp. In addition, the Memorandum, among other things agrees to conduct that constitutes an unlawful group boycott.
>
> As a result of these provisions this company cannot bind itself to the memorandum of Agreement and will not execute a collective bargaining agreement based upon its term.[1]

Between April and August 1976, Local 333 filed four separate charges with the Board, claiming that both General Marine and Berman had engaged in unfair labor practices. The first charge (Case No. 2–CA–14240), filed on April 23, 1976, stated that Berman and its affiliated companies, including General Marine, abrogated the 1976–79 Association contract by sending the April 13th letter to Local 333, thereby indicating a refusal to bargain fairly with the employee rep-

---

1. General Marine sent a virtually identical letter to the Association on the same date. The only difference between the two letters is that the letter to the Association qualified its objection to the scope of the contract by stating that

the agreement contains provisions that "further the interests of other members of the Association at the expense of General Marine Transport Corp."

resentative in the appropriate bargaining unit. The Regional Director refused to issue a complaint in this matter. In a letter dated June 16, 1976, she explained to the union the reasons for her decision:

The investigation discloses that for many years past the only company named in the charge which had been a party to the aforesaid Association agreements was General Marine . . . It appears further from the evidence, that your recent efforts to secure a new contract from General Marine, included a demand that the unit of employees historically represented by you, as noted above, be enlarged to encompass employees and vessels of the various affiliated companies, which employees could not, at this time, appropriately be included in the historical unit . . . Under these circumstances, the refusal by any of the charged parties to execute the Association agreement cannot be deemed to constitute a violation of the Act as alleged by you.

The Regional Director also supported her decision based upon the determination that the vegetable oil clause was an illegal hot cargo clause and called for a group boycott:

Moreover, this agreement contains a provision which the General Counsel has concluded is in violation of Section 8(e) of the Act and is the subject of further proceedings in Case No. 2–CE–93.

The General Counsel of the Board denied Local 333's appeal in July 1976 and its request for reconsideration in August 1976 "substantially for the reasons set forth in the Regional Director's letter . . . "

Local 333 filed a second charge (Case No. 2–CA–14246) on May 18, 1976, stating that General Marine and Berman had refused to bargain, had induced employees to become members of another union, District No. 1— Pacific Coast District, Marine Engineers Beneficial Association, A.F.L.–C.I.O. ("MEBA"), and had conspired with MEBA to achieve this end. On June 30, 1976, two days after the Regional Director had deter-

mined that a complaint should issue alleging unlawful employer assistance,[2] Berman entered into a settlement agreement with the Board in which Berman agreed, *inter alia*, not to recognize MEBA as its employees' bargaining representative until the Board held an election following a representation proceeding that Berman had commenced on June 11, 1976.

Local 333 filed yet another set of charges on August 6, 1976, once again naming Berman and all its affiliates. The charge in Case No. 2–CA–14433–1 stated that the employers abrogated the 1976–79 Association contract by the April 13th letter and thereafter refused to bargain with the union with respect to the employees working on four vessels—the Rebecca K, Susan Frank, Sam Berman, and Richard K.

The charge in Case No. 2–CA–14433–2 set forth identical claims except that they were directed only to employees of three ships replacing vessels listed in the 1969 letter agreement. On August 12, 1976, Berman requested dismissal of these charges on the grounds that they were identical to the previously dismissed charges raised in Case No. 2–CA–14240 and because the settlement agreement in Case No. 2–CA–14246 effectively precluded Berman from entering into an agreement with any union until the representation question was resolved by the Board. Before the Board could act on Berman's request, Local 333 contacted the Regional Director and offered to withdraw the charges. On August 23rd, the Regional Director approved this request.

Having been unsuccessful with its unfair labor practice charges, the president of Local 333 wrote to Jared Stamell, general counsel for the Berman-owned enterprises, on August 18, 1976 stating that "demand is hereby made upon you to collectively bargain concerning the terms and conditions of our labor contract involving the vessels . . . acknowledged to be within the bargaining unit by the 1969 letter [agreement]. Stamell responded to the union's

---

**2.** The Regional Director refused, however, to issue a complaint with respect to the portion of the charge alleging a refusal to bargain for

"substantially the same . . . reasons" as stated in her dismissal letter of June 16, 1976 regarding Case No. 2–CA–14240.

counsel on August 30th in pertinent part as follows:

Dear Mr. Altier:

I have received Local 333, United Marine Division's letters to Berman Enterprises Inc. and other corporations demanding collective bargaining.

I am reviewing the demand on behalf of the corporations in light of the recent activities before the National Labor Relations Board, and the companies will respond directly to the union concerning the demand shortly.

On October 26, 1976, Berman's controller, Susan Frank, wrote to Local 333, advising the union that Berman believed that its August 18th demand was inappropriate because the representation issue was still pending and because the settlement agreement in Case No. 2–CA–14246 precluded Berman from recognizing or bargaining with any union until a board election had been held.

Hearings were held in the representation proceeding during September and October 1976 and the Regional Director issued her decision on December 10, 1976. The Regional Director first reviewed the history of the coverage of Association contracts and found that only three of the vessels that were named in the 1969 letter of understanding were still owned by either Berman or General Marine.[3] She further found that the 1973–76 Association contract had been applied only to the crews of the two ships either owned or operated by General Marine, the Susan Frank and the Rebecca K,[4] and not any Berman vessels. The Regional Director concluded that the 1976–79 Association contract applied to the employees aboard these two vessels because General Marine had not withdrawn in a timely manner from the Association and thus that the contract was a bar to the election petition insofar as the petition purported to include these employees. The Regional Director rejected Local 333's contention that

the 1976–79 Association contract was also binding on Berman and therefore was a bar to an election among Berman employees. Berman, the Regional Director noted, neither executed any document authorizing the Association to act on its behalf nor evidenced its desire to be a part of the multi-employer association by applying the terms of the contract to its employees. Accordingly, the Regional Director ordered that an election be conducted in a unit consisting of "the employees employed by Berman to man the various vessels it operates . . . and [not including] the employees manning the two sludge vessels operated by General Marine . . . ."

Local 333 alone filed a request for review of the Regional Director's decision and direction of election. The Board denied the request on January 10, 1977. Shortly thereafter, the election was held, and on January 20, 1977, the Regional Director certified MEBA as the representative of employees on the vessels of Berman and its affiliates other than the Susan Frank and the Rebecca K.

Between January and March 1977, Local 333, with the representation question settled, demanded that General Marine honor the terms of the Association contract. In a letter dated January 19, 1977, Local 333 wrote:

You have withheld pension insurance payments for these employees since last April during pendency of the Labor Board case. We herewith demand that said payments be reinstituted, including all arrears with interest from their due date.

Local 333 reiterated this request by letter dated February 11, 1977. A union official also telephoned General Marine's vice president, Peter Frank, on three occasions during this period. In each case, he was told that Frank was unavailable and spoke with the general counsel for Berman-owned enterprises. The union official again ex-

3. These three vessels were the Susan Frank, owned by General Marine, and the Sam Berman and the Richard K, sold by General Marine to Berman in 1971 and 1973 respectively.

4. General Marine began operating the Rebecca K after it submitted the authorization form in March 1976 to the Association.

plained that General Marine owed pension and welfare payments to the union and insisted that it abide by the terms of the Association contract with Local 333.

On February 28, 1977, Local 333 filed a final unfair labor practice charge (Case No. 2–CA–14735) and the charge from which this enforcement proceeding arises. Unlike the previous four charges, this charge only named General Marine. On June 16, 1977, exactly one year after her dismissal of the first charge, the Regional Director determined that a complaint *should* issue, alleging that General Marine refused to bargain with Local 333 and violated Section 8(a)(5) and (1) by not abiding by the wage rates and pension and welfare contributions as set forth in the 1976–79 Association contract.

Administrative Law Judge David S. Davidson held a hearing on this matter in February 1978 and issued his decision on June 27, 1978. The ALJ determined that General Marine was foreclosed, pursuant to section 102.67(f) of the Board's Rules and Regulations,[5] from further litigating the issue of the validity of the Association contract since that issue either was or could have been raised in the representation proceeding in which the Regional Director confronted the issue of whether or not the Association contract was a bar to an election among General Marine employees. The ALJ also determined, notwithstanding General Marine's initial repudiation of the Association contract by its letter of April 13, 1976, that the instant complaint was not time-barred by virtue of the six month limitation period set forth in section 10(b) of the NLRA. The ALJ offered two reasons for this conclusion. First, the Regional Director's December 1976 ruling that the Association contract was a bar to an election among General Marine employees, according to the ALJ, altered the circumstances to

such an extent that it completely vitiated General Marine's prior repudiation. The ALJ therefore reasoned that Local 333's letters and phone calls between January and March of 1977 constituted fresh demands within a narrower bargaining unit and that General Marine's subsequent refusals constituted new repudiations of both the Association contract and its obligation to bargain. Secondly, the ALJ advanced what may be characterized as an estoppel theory: "[h]aving pleaded pendency of the petition as a reason not to apply the contract previously [General Marine] cannot now be heard to argue that its failure to apply the agreement after the Regional Director's decision was merely a repetition of its earlier conduct and not an unfair labor practice within the 10(b) period." Because the parties stipulated that General Marine failed to comply with several provisions in the contract since September 1976, and having already determined that the validity of the contract could not be relitigated and that the complaint was timely, the ALJ held that General Marine violated Section 8(a)(5) and (1) of the NLRA and recommended that General Marine be ordered to comply with the terms of the Association contract.

General Marine filed exceptions to the ALJ's recommendation and a motion to reopen the record. In addition, counsel for General Marine requested leave to withdraw. By letter dated September 21, 1978, the Associate Executive Secretary of the Board notified General Marine that the Board had granted the request of counsel to withdraw as well as an extension until October 16, 1978 for new counsel to submit additional argument on the pending motion. Eight days later, however, the Board, without notice to General Marine, summarily affirmed the decision and recommended order of the ALJ. General Marine's new

5. Section 102.67(f) of the Board's Rules and Regulations provides:

The parties may, at any time, waive their right to request review. Failure to request review shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or

could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor proceeding.

counsel continued to pursue his motion for reconsideration and to reopen the record.[6] On January 29, 1979, an order executed under the direction of the Board by its Associate Executive Secretary denied both motions.

### Discussion

In support of its petition to set aside the Board's order, General Marine argues that (1) the complaint is time-barred under section 10(b) of the NLRA because the union filed and served its charge more than six months after the occurrence of the unfair labor practice upon which the complaint is based, (2) the Board violated General Marine's statutory and constitutional rights by foreclosing it from litigating the validity of the Association contract in the unfair labor practice proceeding and (3) the denial of the motion to reopen the record and to reconsider was improper since the Board itself did not decide the motion and because the reasons for the denial were not stated. Because we agree that the complaint is time-barred, we need not consider the remaining issues.

Local 333 filed the charge from which this enforcement proceeding arises on February 28, 1977 and served it on General Marine on March 2, 1977.[7] Thus, the resulting complaint is timely only if the underlying unfair labor practice occurred on or after September 1, 1976. General Marine maintains that the complaint is time-barred since the charge was not filed until almost eleven months after the occurrence of the unfair labor practice—General Marine's initial repudiation of the Association contract on April 13, 1976. This position rests in large part on the Supreme Court's decision in *Local Lodge 1424 International Association of Machinists v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). In *Local Lodge*, a union committed a violation of the NLRA by entering into a collective bargaining agreement containing a union security clause at a time when it did not represent a majority of the employees in the appropriate unit. Charges were filed with the Board ten to twelve months after the execution of the agreement. Conceding that a complaint predicated on the execution of the agreement was time-barred, the Board nevertheless argued that the parties' continued enforcement of the agreement was a separate and continuing unfair labor practice not barred by section 10(b). The Court disagreed, holding that continued enforcement of the contract was not an unfair labor practice without reference to the unlawful execution of the bargaining agreement which had occurred more than six months prior to the filing of the charge. Thus, this was not a situation in which events ante-dating the six month period were being used solely to "shed light" on the events occurring within the limitations period. Instead, the case involved, according to the Court, an unfair labor practice that was "inescapably grounded" on a time-barred event. *Id.* at 422, 80 S.Ct. at 829.

The continuing violation theory that was rejected in *Local Lodge* fares no better when the alleged unfair labor practice is an agreement's continued *repudiation* rather than its continued *enforcement*. In the instant case, the complaint alleges that General Marine engaged in unfair labor practices by continuing to repudiate the Association contract and unilaterally changing ex-

---

**6.** General Marine moved for reconsideration on two grounds: (1) that the Regional Director's ruling in the representation proceeding that the contract was a bar to an election did not determine its validity and (2) that the ALJ's refusal to hear testimony concerning events occurring prior to September 1, 1976—the beginning of the section 10(b) period—was material error. The basis for the motion to reopen the record was to introduce evidence obtained in an antitrust action commenced by General Marine against Local 333, the Association, and certain members of the Association.

**7.** At the hearing before the ALJ, the petitioner was unable to offer the return receipt of the mailing of the charge and thus establish conclusively the date upon which it mailed the charge to Local 333. The ALJ found, however, that other proof offered by General Marine "was sufficient to support an inference that a copy of the charge was mailed on March 2 and thereafter received."

isting wage rates, hours of employment, pension and welfare contributions, and other terms and conditions of employment. *See* Joint Appendix at 5 ¶¶ 7–9. Just as the *Local Lodge* complaint was based upon the time-barred execution of a bargaining agreement, the complaint at issue here unequivocally derives from the time-barred initial repudiation of the Association contract. Other circuits have agreed that an employer's repeated repudiations of a multi-employer association contract constitute neither an unfair labor practice nor give rise to a cause of action with a separate limitation period. *See NLRB v. Serv-All Co. Inc.*, 491 F.2d 1273, 1275 (10th Cir. 1974); *NLRB v. McCready and Sons, Inc.*, 482 F.2d 872, 874–876 (6th Cir. 1973); *NLRB v. Field and Sons, Inc.*, 462 F.2d 748, 750 (1st Cir. 1972); *contra NLRB v. Strong*, 386 F.2d 929, 931 (9th Cir.), *cert. denied* 390 U.S. 920, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968).

 We recognize, as did the ALJ, that an employer's conduct or intervening circumstances can alter the grounds upon which the initial repudiation is based to such an extent as to make subsequent repudiations fundamentally separate unfair labor practices with their own limitation periods. *See NLRB v. McCready and Sons, Inc., supra* at 875 n.3. We conclude, however, that neither General Marine's actions nor events occurring after its April 13, 1976 repudiation changed the circumstances to so great an extent. General Marine initially refused to execute the Association contract on at least two grounds: (1) that the Association exceeded the scope of its authority by entering into a contract which bound not only General Marine but also its "affiliates", i. e. Berman, and (2) that the vegetable oil clause constituted an unlawful group boycott. The Regional Director's December 1976 ruling undisputedly resolved the question of the scope of the contract and, in so doing, eliminated it as a possible basis for General Marine's continued repudiations. However, it could not have resolved the hot cargo clause issue since "[i]t is well settled that contentions of this nature are not litigable in a representation proceeding." *Buckeye Village Market, Inc.*, 175 NLRB 271, 272 (1969), *citing, inter alia, Food Haulers, Inc.*, 136 NLRB 394, 396 n.6 (1962). *See also Kroger Co.*, 165 NLRB 872, 881 (1967) ("[t]he limited scope of a representation case and the basic focus of such a case is illustrated by the fact that a contract containing a 'hot cargo' clause, unlawful under Section 8(e) of the Act has nevertheless been held to be a bar [to an election]"), *citing Food Haulers, Inc., supra.*[8] Indeed, the Regional Director's thorough decision,

---

**8.** At oral argument, the Board and Local 333 contended that *Food Haulers* does not stand for as broad a proposition as the Board cited it for in its brief: that "the existence of a boycott provision unlawful under Section 8(e) of the Act is not a matter which is relevant to or contemplated by a contract bar determination" (Respondent's Brief at 18–19). Instead, they argue that the validity of a group boycott clause would be litigable in a representation proceeding only if the provision, unlike the one included in the 1976–79 Association contract, appeared to be "so basic to the whole scheme of [the] contract and so interwoven with all its terms that it must stand or fall as an entirety." *See NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 78, 73 S.Ct. 519, 523, 97 L.Ed. 832 (1953). Although this position illustrates that General Marine may not have been able to defend against refusal to bargain charges based upon the inclusion of the hot cargo clause in the repudiated contract, *see* dissenting opinion at p. 192, it concedes that the validity of the clause could not have been litigated before the Regional Director.

Local 333 also argues that *Food Haulers* and the other cases relied on by the petitioner only hold that a Regional Director's *rejection* of a contract bar defense in a representation hearing does not amount to a finding of contract validity for all other purposes. These cases do not establish, according to the union, that a Regional Director's *finding* of a contract bar does also determine the validity of the contract. We disagree. In *Food Haulers*, the Board held that a contract containing a hot cargo clause barred an election. In reaching this result, the Board noted that "it has consistently refused to permit litigation of unfair labor practice issues in representation proceedings. The exception was made in the case of unlawful security cases [*C. Hager & Sons Hinge Manufacturing Co.*, 80 NLRB 163 (1948)], as pointed out above, because such clauses—unlike the clause here in issue—impinge directly upon an employee's free choice of bargaining representative, which a representation proceeding is designed to ascertain." *Food Haulers, Inc., supra*, at 396 n.6.

ostensibly in conformity with these precedents, made no findings with respect to the validity of the contract or any clause therein.[9] After a review of the historical coverage of Association contracts, the Regional Director held only that "the 1976–79 Association contract is a bar to the petition insofar as the petition purports to include vessels owned or operated by General Marine including the Susan Frank and the Rebecca K." Thus, when General Marine continued to repudiate the Association contract throughout January and February 1977, one of its two unambiguous and independent reasons for the initial repudiation had not been altered by any intervening Board action. Accordingly, the company's continued repudiations were only a repetition of its earlier conduct rather than a separate unfair labor practice.

The ALJ determined, however, that General Marine was estopped from making this argument since it had relied on the pendency of the representation petition to deflect the union's demands. This is a misstatement of the facts because it was Berman, not General Marine, which followed this course of conduct. On June 30, 1976, two days after the Regional Director determined that a complaint should issue against Berman and its affiliated companies in Case No. 2–CA–14246, only Berman entered into a settlement agreement in which it agreed not to recognize any labor organization until the conclusion of the representation proceeding and a Board certified election. The General Counsel eliminated any doubt that could exist with respect to this point by noting at the hearing before the ALJ that "the only signatory to the settlement agreement is Berman Enterprises and according to the [Regional Director's decision in the representation proceeding], Berman is something distinct from General Marine."

In August 1976, Local 333 wrote to Jared Stamell, general counsel for the Berman-owned enterprises, again to request compli-

ance with the terms of the collective bargaining agreement. Although Stamell stated that he was "reviewing the demand on behalf of the *corporations*," he concluded by saying that "*the companies will respond directly to the union concerning the demand shortly* (emphasis added)." Berman did so on October 26, 1976. Susan Frank, the company's controller wrote:

> As you know, a petition for an election . . . is pending before the National Labor Relations Board. Furthermore, *this company* is precluded by the settlement agreement in the charge brought by . . . Local 333, from recognizing and bargaining with any union until after an NLRB election has been held.
>
> Under these circumstances, we believe that your demand is inappropriate and we ask that you withdraw it.
>
> Very truly yours,
> BERMAN ENTERPRISES, INC.

(emphasis added). Nothing in this letter indicates that Berman was speaking both for itself and on behalf of General Marine. In fact, the clear wording of the letter is to the contrary. Moreover, we are particularly wary to read this statement as an expression of General Marine's view since the gravamen of the tortured proceedings between the employers and Local 333 revolved around the non-recognition of the separate representational status of the employees working on Berman vessels. Finally, even assuming for the sake of argument that these letters could be considered somewhat equivocal, neither rises to the level of the kind of affirmative misrepresentations traditionally deemed essential for a party to be estopped from asserting a statute of limitations defense. *See, e. g.* Note, Developments in the Law—Statute of Limitations, 63 *Harv.L.Rev.* 1178, 1220–21 & n.354 (1950).

In short, we find that Local 333 could have filed the instant charge any time after

---

9. The union's statement that "extensive evidence was also adduced at the representation hearing concerning . . . the incidents leading to the alleged hot cargo clause dealing with towing vegetable oil clause" (Intervenor's Brief at 21–22) is not to the contrary. Our examination of the pages cited by the union for the above-quoted assertion indicates that the issue of the legality of the vegetable oil clause was hardly raised, let alone fully litigated.

April 13, 1976, *see Nazareth Regional High School v. NLRB*, 549 F.2d 873, 882 (2d Cir. 1977); *Local 1104, Communication Workers v. NLRB*, 520 F.2d 411, 416 (2d Cir. 1975), *cert. denied* 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976) and that nothing relieves it from its failure to do so within six months from that date. The intervenor argues that it was understandably unsure of the vessels covered by the Association contract and the companies to which it should have addressed its demand. This uncertainty may explain its reason for deciding to make a demand in a unit consisting of Berman and all its affiliated companies in the first charge filed ten days after the initial repudiation. However, it clearly does not explain why the union persisted in making demands in a broadened unit after the Regional Director twice refused, as early as June 1976, to issue complaints related to the repudiation of the contract on the ground that affiliated companies simply "could not . . . appropriately be included in the historical unit . . ." Based upon this clear direction, we do not believe that this case presents a situation, as the dissent suggests, in which the union was compelled to file separate and admittedly wasteful charges "covering every possible combination of employees it claim[ed] to represent" in order to be assured that it filed a timely charge in the appropriate bargaining unit as later determined at the representation hearing.

Accordingly, the petition for review is granted, the order set aside, and the cross-application for enforcement denied.

MANSFIELD, Circuit Judge (dissenting):

The majority, by holding that the unfair labor practice charge filed by Local 333 in February, 1977, was time-barred by § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), unfortunately reaches an unjust result. It does this by drawing unwarranted formalistic differentiations between closely affiliated members of the "Berman Family"—General Marine Transport Corp. (General Marine) and Berman Enterprises Inc. (Berman)—rather than by looking to the substance of their status as subsidiaries of one Berman holding company which constitutes one family enterprise engaged in operating sludge vessels. It disregards the fact that Local 333's earlier unfair labor complaint against General Marine, admittedly timely, could not be resolved until the Regional Director identified the vessels represented by Local 333 as distinguished from those represented by the Marine Engineers Beneficial Association (MEBA), which did not finally occur until December 10, 1976, when the representation proceedings instituted by the Berman Family were concluded. Lastly, it gives no effect to the fact that when Local 333 withdrew its timely-filed complaint in August 1976 after Berman moved to dismiss because of the pending representation proceedings, Local 333 was induced to refrain from further action pending those proceedings by Berman representations that the "corporations" (including General Marine) were considering the Union's demands but were "precluded" from bargaining until conclusion of the pending Board proceeding that would resolve which vessels were represented by Local 333 and which by MEBA.

Under the circumstances, fairness dictates (1) that General Marine be estopped from asserting a statute of limitations defense, and (2) that its refusal to bargain upon conclusion of the representation proceedings be held to constitute a new unfair labor practice. For these reasons I would enforce the Board's order with respect to the two vessels operated by General Marine.

The facts are simple and straight-forward. In March, 1976, Local 333 reached a collective bargaining agreement with the New York Marine Towing and Transportation Association (the Association). On April 13, 1976, General Marine, a member to the Association, made known its objections to the agreement in a letter to Local 333, complaining primarily on the ground that it purported to bind the parent and affiliates of General Marine (i. e., Berman Enterprises), for whom the Association was not authorized to bargain.

On April 23, 1976, Local 333 filed charges with the Board claiming that General Marine and its affiliates in the Berman Family had, by the April 13 letter, refused to bar-

gain in violation of the National Labor Relations Act. On May 18, the Union filed a second complaint, charging that General Marine and Berman had induced employees to join a different union, the Marine Engineers Beneficial Association (MEBA). On June 11, Berman commenced a proceeding to determine whether MEBA or Local 333 was the proper employee bargaining representative. On August 6, Local 333 filed another set of charges naming Berman and General Marine and alleging that they had refused to bargain with respect to employees working on several named vessels. Berman argued that these charges were duplicative of the charges already filed and that it was precluded by representation proceedings pending before the Board, to which it had agreed in settlement of the earlier charges, from entering into an agreement with any union until representation would be resolved. General Marine was inextricably involved in these proceedings, since it had claimed to have only one vessel, the Susan Frank, represented by Local 333, and that Local was claiming more vessels. (Eventually it was found to represent two vessels.) As a result, Local 333 withdrew its complaint.

On August 18, 1976, Local 333 sent a letter to Berman and all its affiliates, *including General Marine*. The letter was addressed to Jared Stamell, Esq., who represented both Berman and General Marine together as members of the Berman Family. The letter demanded collective bargaining with respect to employees working on two vessels run by General Marine, the Susan Frank and the Rebecca K, as well as two others which proved not to be in service. Stamell responded that he was "reviewing the demand on behalf of the corporations" and added that "the companies will respond directly to the union concerning the demand shortly." In a letter dated October 26, 1976, Berman's controller Susan Frank (presumably the namesake of General Marine's ship Susan Frank) responded that the company was precluded from dealing with the demand by the pendency of representation proceedings before the NLRB. She did not specify whether she was speaking solely for Berman or for its subsidiaries as well.

On December 10, 1976, the Regional Director of the Board resolved the confusion as to which employees were represented by Local 333, determining that only those employed on the Susan Frank and the Rebecca K were so included. Each of these vessels had been named in Local 333's August 6 charges. In the three months following the NLRB determination, Local 333 demanded that General Marine adhere to the terms of the March 1976 agreement insofar as it applied to the two vessels. General Marine refused, and on February 28, 1977, Local 333 filed the unfair labor practice charge from which this proceeding arises.

General Marine now argues that the six-month statute of limitations of § 10(b) began running on April 13, 1976, the day it made known its initial refusal to comply with the contract, and that neither its conduct subsequent to that date nor intervening developments (especially the December 1976 Board determination) justify a conclusion that the statute of limitations is inapplicable. I cannot agree. In my view the conduct of General Marine and its representatives estops them from raising the statute of limitations defense and the December 1976 Board determination sufficiently changed the circumstances to render General Marine's subsequent refusal to comply with the agreement in its revised scope a new alleged unfair labor practice, restarting the limitations period.

General Marine's conduct should deprive it of the right to raise the statute of limitations defense because it put off Local 333's demands by relying on the pendency of the representation proceeding before the Board. The Administrative Law Judge and the NLRB so found, but the majority differs with them.

The April 1976 charges of Local 333 sought to compel General Marine to adhere to the collective bargaining agreement. General Marine was clearly put on notice of the union's demands. Yet because of the dispute over the extent to which General Marine's affiliates were bound, General Marine was able to avoid complying with the agreement even to the extent of those employees undisputedly within the bargaining

unit. By the time the confusion as to the scope of the agreement was cleared up (in December 1976), more than six months had passed since General Marine's initial repudiation of the contract.

The majority argues that as early as June 1976 Local 333 should have known to make its demands solely with respect to the vessels ultimately found to be within the bargaining unit. The record clearly demonstrates that Local 333 attempted to do just that, but fell prey to the representations of General Marine. First, General Marine argued that the August 6 complaint (filed within the limitations period), which properly named the Susan Frank and the Rebecca K, was duplicative of the earlier charges, and Local 333 obligingly withdrew the charges, relying on the earlier charges. Second, the responses to the August 18 letter gave an unmistakable indication that General Marine sought to postpone consideration of the union's demands until the pending Board proceedings were resolved. In my view, each of these actions by General Marine suffices to estop it from advancing the statute of limitations defense.

The majority, parsing the nuances of the Frank letter, concludes that it was meant as the statement of only Berman, not General Marine. In effect, then, Berman is permitted to make Local 333 the unknowing and unwilling participant in a high-stakes shell game, forced to guess which letter conceals the representations of which member of the Berman Family. Since the underlying demand by Local 333 pertained to General Marine's vessels, the correspondence was with the counsel representing both General Marine and Berman, Berman was closely affiliated to General Marine as part of the Berman Family enterprise and the letter was so ambiguous that only the most distrusting and sensitive reader would have suspected that only Berman itself was responding, General Marine should not be permitted to take advantage of the confusion it created.

Even if there were no such estoppel, I would conclude that the resolution of the dispute over which employees were covered by the contract changed the circumstances sufficiently to render General Marine's subsequent refusal to execute the agreement grounds for a new unfair labor practice charge. I recognize that absent a change of circumstances the statute of limitations begins running with the first refusal to execute an agreement, and not with subsequent refusals. See *NLRB v. Serv-All Co.*, 491 F.2d 1273, 1275 (10th Cir. 1974); *NLRB v. McCready and Sons, Inc.*, 482 F.2d 872, 874–76 (6th Cir. 1973). Cf. *Local Lodge 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). Here, however, there was such a change of circumstances.

The Board's determination in December 1976 definitively resolved the question of applicability of the contract to the Susan Frank and the Rebecca K. With the contract thus narrowed to eliminate the extension to all Berman vessels, Local 333 properly made a new demand for compliance with the contract as now revised by the Board. General Marine's refusal constituted a new alleged unfair labor practice because of this intervening change in circumstances. Cf. *NLRB v. McCready and Sons, Inc., supra*, 482 F.2d at 875–76 & n.3 (action barred after six months absent a change in position in the interim).

A contrary conclusion would compel a union, under such circumstances, to file separate sets of charges covering every possible combination of employees it claims to represent. Hearings on these charges would presumably be stayed until the Board determined which employees the union was actually entitled to represent. Once this determination was made, the union would be able to pursue whichever of its earlier-filed charges named the correct group of employees. This, it seems to me, is unnecessarily wasteful. Much. more sensible is the course of events which actually occurred here. Local 333 made its charges with respect to all of the employees it claimed to represent, the Board determined which of those employees the union did in fact represent, and Local 333 promptly made a demand as to only those employees. When the employer refused the demand, the union immediately filed its charges. The process is entirely consistent with the policies of the statute of limitations. It would not lead to litigation "after records

have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused," H.R.Rep. 245, 80th Cong., 1st Sess. 40, quoted in *Local Lodge 1424 v. NLRB, supra,* 362 U.S. at 419, 80 S.Ct. at 828; see also *NLRB v. Auto Warehousers, Inc.,* 571 F.2d 860, 863 (5th Cir. 1978), because there was a full Board proceeding within six months of the time the charge was filed. Given the unchallenged good faith of Local 333, I would therefore conclude that the statute of limitations began running at the time of the Board determination in December 1976, and thus that this action was timely.

I find no merit in the other arguments raised by General Marine on appeal. The Administrative Law Judge acted properly when he precluded General Marine from relitigating the issue of which employees were covered by the agreement. See 29 C.F.R. § 102.67(f). "It is well established that the Board will not permit litigation at an unfair labor practice proceeding of matters which were, or could have been, litigated in the underlying representation proceeding." *NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 683 (2d Cir. 1971). General Marine took no appeal from the representation proceeding and was therefore bound by its results.

The presence of the unlawful hot cargo clause in the agreement did not invalidate the entire agreement as to General Marine. See *Chattanooga Mailers Union v. Chattanooga News-Free Press Co.,* 524 F.2d 1305, 1313 (6th Cir. 1975). The clause was not "so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entirety." *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 78, 73 S.Ct. 519, 523, 97 L.Ed. 832 (1953). Indeed, the clause had no effect whatever on General Marine since its vessels did not tow vegetable oil barges.

Similarly, the presence of the "affiliated companies" clause did not relieve General Marine of its obligations, since that clause had been removed in the representation proceeding.

Finally, I find no merit in General Marine's argument that the denial of its mo-

tions for reconsideration and to reopen the record before the Board (after the Administrative Law Judge's decision) was impermissible. It is clear that no new arguments or relevant evidence were being advanced. The motion was "denied as lacking in merit."

There was no improper delegation in having the order signed by the Associate Executive Secretary of the Board. Unlike the situation in *KFC National Management Corp. v. NLRB,* 497 F.2d 298 (2d Cir. 1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976), there was no evidence here that the motion was not considered by three members of the Board, as required; indeed, at oral argument we were advised that it was so considered.

I therefore conclude that the order of the Board should be affirmed and enforced, and must respectfully dissent.