774 F.2d 1376
 120 L.R.R.M. (BNA) 2992, 103 Lab.Cas. P 11,627
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Jack E. HARTMAN, a Sole Proprietorship, d/b/a Dependable
Tile Company, Respondent.
TILE LAYERS LOCAL UNION NO. 19 OF the BRICKLAYERS AND ALLIED
CRAFTSMEN OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 84-7486, 84-7786.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 14, 1985.
Decided Oct. 24, 1985.
 
 McCarthy, Johnson & Miller, John J. Davis, San Francisco, Cal., Kenneth Hipp, N.L.R.B., Washington, D.C., for petitioner.
 Thierman, Simpson & Cook, Mark R. Thierman, Ronald W. Brown, Sacramento, Cal., for respondent.
 Application for Enforcement and Petition for Review of an Order of the National Labor Relations Board.
 Before CHOY, TANG and FLETCHER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 In this consolidated appeal, the National Labor Relations Board ("NLRB" or "Board") petitions for enforcement of its order finding that the Dependable Tile Company ("Dependable") committed an unfair labor practice in refusing to comply with a collective bargaining agreement negotiated by a multi-employer bargaining unit. Additionally, Tile Layers Local Union No. 19, ("the Union") petitions for review of the scope of the make-whole order entered against Dependable and of the dismissal of the complaint filed against Reliable Tile Company ("Reliable"). We grant enforcement of the order against Dependable, as modified to extend retroactively the period of make-whole recovery to the inception date of the collective bargaining agreement. We affirm the dismissal of the complaint against Reliable.
 
 I. FACTS
 
 2
 Jack Hartman owns and operates Dependable, a sole proprietorship, in Loomis, California. Dependable contracts for ceramic tile installation and finishing, and employs tile layers, who have been represented by the Union since 1977.
 
 
 3
 In 1975 or 1976, the contractors in and near Sacramento, California, formed the Associated Tile Contractors of Northern California ("the Association" or "the Sacramento Association"), a multi-employer bargaining unit. In 1978, the Union negotiated with the Association and with the Tile Contractors Association of Northern California ("the Bay Area Association"), a separate multi-employer unit representing contractors in the San Francisco area, to reach a single collective bargaining agreement applicable to both multi-employer units. This agreement, known as the "Blue Book" was effective from April 1, 1978 to March 31, 1981. Dependable initially signed the Blue Book as an independent but joined the Association in 1979. Hartman became a member of the Association's negotiating committee.
 
 
 4
 During the latter half of 1980, the Association and the Union began informal negotiations for a contract to succeed the Blue Book. The Association was interested especially in obtaining a contract separate from any agreement between the Union and the Bay Area Association.
 
 
 5
 Sometime in November or December of 1980, a meeting of all the members of the Association was held. At the meeting, it was pointed out that individual contractors could give notice to the Union of their intention not to be bound by group bargaining, but instead to seek separate, individual agreements. A sample form letter to this effect was circulated to the membership.
 
 
 6
 On December 31, 1980, within the period allowed under the Blue Book, Hartman sent an adapted copy of the letter to the Union, announcing Dependable's withdrawal from the Association as of the final day of the term of the Blue Book, March 31, 1981.[1] In all, ten of the Association's twenty-three members sent similar withdrawal letters before formal negotiations began. Another six sent withdrawal notices after negotiations began.
 
 
 7
 Formal contract negotiations between the Union and the Association began in mid-January, 1981. From January 20 to March 31, the parties met in six bargaining sessions. At each of these sessions the Association was represented by Adam De Bacco of Reliable, Randy Yeager of Yeager Tile, Jay Fischer of Fischer Tile and Marble, and Jack Hartman of Dependable. Although the four Association negotiators were bargaining only for a multi-employer contract, each of their companies had sent a form letter purporting to withdraw from the Association effective March 31.
 
 
 8
 Hartman took an active role in the negotiations, never mentioning his withdrawal letter. Nor did he indicate that he was negotiating as an independent or that he was present in any capacity other than as a negotiator for the Association.
 
 
 9
 Since the parties had not reached agreement on a new contract when the Blue Book expired on March 31, the Union went on strike. During the strike, the Union attempted to secure interim agreements from the Association and from individual contractors. During April, eight Association members, including Reliable, signed individual interim agreements.[2] On April 7, Jay Fischer, on behalf of the Association, executed an interim agreement with the Union. At that time, the Union representatives were told that Dependable was no longer a member of the Association. Five weeks later, the Association furnished the Union with a list of the contractors that had resigned; Dependable's name was on the list of resignees. However, the Association later told the Union that many contractors would rejoin the Association when a final agreement was reached.
 
 
 10
 The Association's negotiating committee, represented by Fischer and Yeager, next met with the Union on August 6, 1981. Prior to that time, the Union had finalized a new agreement with the Bay Area Association, known as the "Brown Book." At the meeting, the Union presented the Brown Book as a proposed contract between it and the Sacramento Association. The Association's negotiators refused to accept the Brown Book and asserted that many issues remained to be negotiated. The Union sent the Brown Book to all contractors in the Sacramento area; six contractors signed it.
 
 
 11
 On September 22, 1981, the parties met again and reached tentative agreement on a number of outstanding issues, including agreement that the Sacramento Association's contract would be separate from the Brown Book applicable to the Bay Area Association.
 
 
 12
 In October, the parties completed their negotiations, and in mid-November, they executed a final agreement, known as the "Yellow Book." The Union mailed copies of the agreement to the Sacramento area contractors, requesting their signatures. Neither Dependable nor Reliable responded to this request.
 
 
 13
 Jack Hartman did not attend any negotiating sessions after March 31, 1981. On August 12, 1981, Dependable filed a representation petition with the Board, seeking an election among its employees to determine whether they desired union representation. The NLRB regional director dismissed Dependable's petition, finding that Dependable's initial withdrawal from the Association was ineffective due to Hartman's continued participation in negotiations between the Association and the Union, thus making a single-employer bargaining unit inappropriate.
 
 
 14
 On February 11, 1982, after Dependable had refused to sign the Yellow Book and had refused to comply with its terms, the Union filed unfair labor practice charges against the company. The Union also filed charges against Reliable, based on its failure to respond to the letter requesting that it sign and return a copy of the Yellow Book agreement.
 
 
 15
 After a full hearing, the Administrative Law Judge found that Dependable had committed an unfair labor practice in violation of sections 8(a)(5) and (1) of the Act, 29 U.S.C. Sec. 158(a)(1), (5) (1982), by refusing to comply with the Yellow Book agreement. The ALJ dismissed the complaint against Reliable, on the basis that the General Counsel had failed to establish that Reliable had refused to comply with the agreement.
 
 
 16
 A panel of the NLRB, with one member dissenting, affirmed the ALJ's decision. Dependable Tile Co., 268 N.L.R.B. No. 166 (1984). The Board's order directed Dependable to give retroactive effect to the Yellow Book agreement to November 15, 1981, the date the Union first demanded that Dependable sign the agreement.
 
 
 17
 The NLRB then applied to this court for enforcement of its order, and Dependable and the Union cross-petitioned for review.
 
 II. DISCUSSION
 
 18
 A. Timeliness of Complaint Against Dependable
 
 
 19
 At the outset, Dependable contends that the complaint against it was time-barred under the six-month limitation period contained in section 10(b) of the Act. 29 U.S.C. Sec. 160(b) (1982).[3] Dependable argues that it repudiated the multi-employer bargaining agreement when it refused to abide by the interim agreement between the Association and the Union executed on April 7, 1981, and that the six-month limitation period ran from the date. Thus, according to Dependable, the charge upon which this action is based, filed February 11, 1982, is time-barred because it came more than ten months after the alleged unfair labor practice occurred.
 
 
 20
 Dependable relies on the Supreme Court's decision in Local Lodge No. 1424, International Association of Machinists v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (Bryan Manufacturing ), which held that section 10(b) barred an action challenging enforcement of a union security clause. The charges alleged that the collective bargaining agreement containing the clause had been executed at a time when the union lacked majority status. The charges were filed ten to twelve months after the collective bargaining agreement was executed. The Court reasoned that continued enforcement of the union security clause itself was permissible and could only be deemed an unfair labor practice based on events falling outside the six-month limitation period, i.e., the initial execution of the agreement when the union lacked majority status. Id. at 417, 80 S.Ct. at 827. Summarizing, the Court distinguished "two different kinds of situations," id. at 416, 80 S.Ct. at 826, in which events antedating the limitation period bear on events falling within the period:
 
 
 21
 The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose Sec. 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.
 
 
 22
 Id. at 416-17, 80 S.Ct. at 826-27.
 
 
 23
 Dependable asserts that this case involves the second kind of situation, that its refusal to sign the Yellow Book agreement in November 1981 was found to be an unfair labor practice only by reference to its repudiation of and withdrawal from group bargaining in April 1981. In support of this interpretation of Bryan Manufacturing, Dependable cites cases from other circuits. See, e.g., General Marine Transport Corp. v. NLRB, 619 F.2d 180 (2d Cir.1980); NLRB v. Preston H. Haskell Co., 616 F.2d 136 (5th Cir.1980).[4]
 
 
 24
 Dependable overlooks our decision in NLRB v. Strong, 386 F.2d 929 (9th Cir.1968), rev'd on other grounds, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). In Strong, the employer refused to execute a collective bargaining agreement negotiated by a multi-employer unit of which he was a member. The employer first refused to sign approximately eight and one-half months before the unfair labor charge was filed. He refused again just two months before the charge was filed. This court held that the employer's obligation to bargain and to execute the contract was continuing, and therefore each of his refusals to sign the contract constituted a separate unfair labor practice. Id. at 931. Since the last refusal occurred within six months of the date the charge was filed, we held the case to be timely under section 10(b). Interpreting Bryan Manufacturing, we said that the employer's earlier repudiation of the contract should be considered simply as "evidence to shed light on the true character of the refusals occurring within the limitation period." Id. (citation omitted).
 
 
 25
 Dependable's refusal to sign the Yellow Book in November was separable from its earlier refusal to accept the interim agreement. In fact, Dependable's refusals are more clearly separable events than were the employer's repeated refusals to sign a permanent agreement in Strong. Dependable's obligation to sign the Yellow Book arose only after that agreement was finalized. We need not refer back to Dependable's earlier refusal to sign an interim agreement in order to establish that its refusal to sign the final agreement was, itself, an unfair labor practice. The November refusal fell within the six-month limitation period, and so the charge was timely under section 10(b).[5]
 
 
 26
 B. Dependable's Purported Withdrawal from the Association
 
 
 27
 An employer who is a member of a multi-employer bargaining association is bound by an agreement negotiated by the association. See Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982); Seattle Auto Glass v. NLRB, 669 F.2d 1332, 1334 (9th Cir.1982). Once a multi-employer bargaining unit is established, "the Act dictates that reasonable controls limit the parties as to the time and manner that withdrawal will be permitted" in order to achieve stability in multi-employer bargaining relationships. Retail Associates, Inc., 120 N.L.R.B. 388, 393 (1958).
 
 
 28
 Before negotiations begin, an employer may withdraw from a multi-employer unit, but once negotiations have begun, withdrawal is not permitted absent mutual consent or "unusual circumstances." Retail Associates, Inc., 120 N.L.R.B. at 395. Moreover, a withdrawal from a multi-employer unit, to be effective, must be unequivocal.
 
 
 29
 The decision to withdraw must contemplate a sincere abandonment, with relative permanency, of the multi-employer unit and the embracement of a different course of bargaining on an individual-employer basis.
 
 
 30
 Id. at 394. An employer is not free to attempt to " 'secure the best of two worlds' " by filing a purported withdrawal and then remaining in a multi-employer unit in hopes of securing advantageous terms through group negotiations. NLRB v. Associated Shower Door Co., 512 F.2d 230, 233 (9th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); accord Michael J. Bollinger Co., 252 N.L.R.B. 406, 407-08 (1980), enforced mem., 705 F.2d 444 (4th Cir.1983). Clearly, all parties to collective bargaining need to know with whom they are bargaining and who will be bound by any agreement that is reached.
 
 
 31
 The Supreme Court has cautioned specifically in the multi-employer bargaining context that we must defer to the Board's expertise and to the balance of " 'conflicting legitimate interests' " it strikes. Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. at 413, 102 S.Ct. at 725 (quoting NLRB v. Truck Drivers Local No. 449, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957) ). Thus, we review the Board's policy determinations to see whether they are arbitrary or contrary to law, id.; we review the Board's underlying factual findings under the substantial evidence standard. Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-97, 71 S.Ct. 456, 465-69, 95 L.Ed. 456 (1951); NLRB v. Associated Shower Door Co., 512 F.2d at 233.
 
 
 32
 Dependable's initial withdrawal from the Association by letter on December 31, 1980, was timely under Retail Associates; it was within the time period set forth in the contract, and it was before formal negotiations began. The question, then, is whether Dependable's subsequent conduct nullified its withdrawal.
 
 
 33
 We faced a similar issue in NLRB v. Associated Shower Door Co., 512 F.2d at 230. We held that two employers effectively withdrew from collective bargaining when negotiations reached an impasse,[6] but that the employers' subsequent conduct, attending and participating in negotiating sessions, constituted a retraction of the withdrawals. Id. at 232-33.
 
 
 34
 Dependable argues that Associated Shower is distinguishable because in that case the employers participated in group negotiations after the effective date of their withdrawals, whereas Dependable withdrew conditionally and prospectively, and Hartman did not participate in negotiations after the announced withdrawal date.
 
 
 35
 We agree with Dependable's assertion that an employer can withdraw from a multi-employer association, effective at some future time or conditioned on some future event. Justice Stevens contemplated this sort of withdrawal in his concurring opinion in Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. at 420, 102 S.Ct. at 729 (Stevens, J., concurring).[7] The Board in this case recognized the propriety of prospective withdrawals when it acknowledged that Dependable's notice of withdrawal would have been effective "absent subsequent events." 268 N.L.R.B. at 1147.
 
 
 36
 The Board found that Dependable's (and Hartman's) subsequent conduct was inconsistent with the stated intent to abandon group bargaining and negotiate separately. We conclude that substantial evidence supports the Board's decision.
 
 
 37
 Hartman took an active role in the first six bargaining sessions. The withdrawal letter Dependable had sent to the Union said nothing whatever about Hartman continuing to participate in group bargaining in any capacity. See supra note 2. During the bargaining sessions, Hartman didn't mention the letter or the capacity in which he was present. See Associated Shower Door Co., 512 F.2d at 233.
 
 
 38
 Although employers of all four members of the Association negotiating committee had submitted withdrawal letters, none of the negotiators claimed that they were bargaining as independents, or that they were representing the Association but not their own companies. Dependable would have us believe that the Union was dealing with a negotiating committee whose members had rejected the unit for which they were bargaining. These circumstances suggest that the withdrawal letters were mere threats of withdrawal, as the Union characterized them, rather than a sincere abandonment of the multi-employer unit, as contemplated by Retail Associates, 120 N.L.R.B. at 394.
 
 
 39
 Dependable asserts that Hartman's conduct after March 31, the stated withdrawal date, was consistent with an intent to abandon the Association. Hartman did not participate in bargaining sessions after that date. But the Board's decision implicitly concludes that by March 31 Dependable had already retracted its withdrawal. We find that decision supported by the record.[8]
 
 C. Union Consent to Dependable's Withdrawal
 
 40
 Dependable alternatively asserts that if its original withdrawal was nullified by Hartman's conduct, the Union nonetheless consented to the withdrawal after Hartman stopped attending negotiating sessions on March 31. Mutual consent is an exception to the general rule that an employer may not withdraw from a multi-employer unit once negotiations have begun. Retail Associates, Inc., 120 N.L.R.B. at 396; see NLRB v. Teamsters Union Local No. 378, 672 F.2d 741, 743 (9th Cir.1982).
 
 
 41
 Most of Dependable's argument is based on the Union's silence and inaction. Dependable points to the Union's failure to object when, after March 31, the Association furnished lists of its members and Dependable's name was missing from those lists. However, a union is under no duty to protest in any formal manner an employer's attempted withdrawal. NLRB v. John J. Corbett Press, Inc., 401 F.2d 673, 675 (2d Cir.1968); accord NLRB v. Callier, 630 F.2d 595, 599 (8th Cir.1980); see also NLRB v. Strong, 386 F.2d 929, 933 (9th Cir.1967) (approving trial examiner's finding that union representative's failure to tell employer that he was bound by master contract was not a waiver of the employer's purported withdrawal), rev'd on other grounds, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1967). In any event, it is clear from the record that the Union was not entirely silent concerning Dependable's withdrawal. It expressly announced that it considered the purported withdrawals as mere bargaining tactics designed to threaten and intimidate the Union. The Union's conduct was consistent with that position.
 
 
 42
 To establish that the Union consented by its conduct, Dependable must show that the conduct amounted to " 'a course of affirmative action clearly antithetical to' the claim that no withdrawal [had] occurred." NLRB v. Charles D. Bonanno Linen Service, Inc., 630 F.2d 25, 35 (1st Cir.1980) (quoting I.C. Refrigeration Service, 200 N.L.R.B. 687, 689 (1972) ), aff'd, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982). Dependable cites as affirmative conduct the Union's seeking "separate negotiations" with Dependable and continuing its strike against Dependable after the Association had signed an interim agreement on April 7.
 
 
 43
 Separate negotiations between a union and an employer after the employer purports to withdraw may be grounds from which the Union's consent can be inferred. Harding Glass Industries, Inc. v. NLRB, 672 F.2d 1330, 1334 (10th Cir.1982); Louisville Plate Glass Co., 243 N.L.R.B. 1175, 1186 (1979), enforced; 657 F.2d 106 (6th Cir.1981); see, e.g., NLRB v. Hayden Electric, Inc., 693 F.2d 1358, 1365-67 (11th Cir.1982); Fairmont Foods Co. v. NLRB, 471 F.2d 1170, 1173-74 (8th Cir.1972). However, Dependable's contention of "separate negotiations" is based on the Union's attempt to get Dependable to sign an interim agreement, which specifically contemplated binding Dependable to a final agreement when negotiated between the Association and the Union.[9] The Union was not seeking to negotiate with Dependable separately. Rather, it was trying to negotiate a temporary settlement with all employers, pending final agreement with the Association.
 
 
 44
 We do not find the continuation of the strike against Dependable probative. It is not clear from the record why the Union continued its strike against Dependable but not other employers after April 7. An explanation easily as plausible as Dependable's is that the Union felt that Dependable was bound by the April 7 interim agreement as a member of the Association and that it continued the strike because Dependable refused to abide by that agreement.
 
 
 45
 Substantial evidence supports the Board's finding that the Union did not consent to Dependable's withdrawal. The Union at no time sought to negotiate separately with Dependable for a permanent agreement; the Union accepted no benefit flowing from Dependable's withdrawal; the Union filed unfair labor practice charges promptly after Dependable refused to sign the final agreement. These all negate any suggestion that the Union acquiesced in or consented to withdrawal by Dependable. See NLRB v. Charles D. Bonanno Linen Service, Inc., 630 F.2d at 35.
 
 D. Fragmentation of the Bargaining Unit
 
 46
 Dependable also contends that it was entitled to withdraw because the Association was fragmented by withdrawals that occurred during the negotiations. The Board properly rejected this argument.
 
 
 47
 Twenty-three contractors belonged to the Association before negotiations began for a contract to succeed the Blue Book. Ten contractors submitted timely withdrawals before negotiations started, reducing the bargaining unit to thirteen members.[10] Dependable and Yeager Tile nullified their withdrawals when they participated in negotiations, thereby increasing the Union to fifteen contractors employing forty-five persons represented by the Union. Four additional employers had rejoined by the time agreement was substantially reached.
 
 
 48
 Fragmentation of a multi-employer bargaining unit is an "unusual circumstance" that, under the Retail Associates rule, may justify an employer's unilateral withdrawal from the unit during negotiations. See Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. at 414-15, 102 S.Ct. at 726-727; Connell Typesetting Co., 212 N.L.R.B. 918, 921 (1974). Unit fragmentation occurs if, after negotiations have begun, a substantial proportion of the members of the bargaining unit properly withdraw from it. In Seattle Auto Glass v. NLRB, 669 F.2d at 1332, for instance, we held that when the union entered a separate permanent agreement with one member of a multi-employer unit, whose employees constituted thirty percent of those employed by the unit, that action " 'effectively fragmented and destroyed the integrity of the bargaining unit.' " Id. at 1336-37 (quoting Charles D. Bonanno Linen Service, 243 N.L.R.B. 1093, 1096 (1979) ).
 
 
 49
 Dependable asserts that the bargaining unit was fragmented when eight contractors signed interim agreements after the Blue Book expired.[11] However, the execution of temporary agreements pending negotiation of a final contract, is not inconsistent with the concept of multi-employer bargaining units. See Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. at 414-15, 102 S.Ct. at 726-27. Separate interim agreements that bind the employers to any final settlement resulting from multi-employer bargaining do not weaken the multi-employer unit. Id. at 414, 102 S.Ct. at 726. See also Seattle Auto Glass, 669 F.2d at 1335. Accordingly, the fact that some employers signed interim agreements does not establish unit fragmentation.
 
 
 50
 Dependable also asserts that the Association was fragmented when six employers signed the Brown Book, the agreement the Union had negotiated with the San Francisco Association. Even were we to assume that these six employers signed separate, permanent agreements that placed them outside the Sacramento Association,[12] we would not find "substantial fragmentation" that effectively destroyed the integrity of the bargaining unit. Although the six contractors were approximately a third of the employers bound by the negotiations, they employed only three unit employees, or less than seven percent of the total of those employees bound by the negotiations.
 
 
 51
 Dependable has not shown that any employer properly withdrew from the Association after bargaining began. In fact, the record suggests that the bargaining unit was strengthened rather than weakened during negotiations. Four employers who had timely withdrawn were Association members on September 22, 1981, when agreement on most of the terms of the Yellow Book finally was reached.[13]
 
 E. Period of Make-Whole Remedy
 
 52
 To remedy Dependable's refusal to sign and abide by the collective bargaining agreement, the ALJ recommended that Dependable be ordered to comply with the terms of the Yellow Book agreement, retroactive to November 15, 1981, the date Dependable first refused to sign the Yellow Book. The NLRB adopted the ALJ's remedy without comment. The Union asserts that the Board erred and that it should have given retroactive effect to the agreement back to April 1, 1981, its inception date. We agree.
 
 
 53
 The NLRB is vested with broad discretion in devising remedies for unfair labor practices. Detroit Edison Co. v. NLRB, 440 U.S. 301, 316, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979).[14] "Nonetheless, the rule of deference to the Board's choice of remedy does not constitute a blank check for arbitrary action." Id. In particular, if the Board identifies no justification for a remedy granting inadequate protection to important interests of a party, it abuses its discretion. Id. at 316-17, 99 S.Ct. at 1131-32.
 
 
 54
 The Board itself traditionally has granted relief retroactive to the inception date of a contract in cases such as this one. In Polar Air Sheet Metal Co., 264 N.L.R.B. 1331 (1982), the Board said:
 
 
 55
 In cases where respondents have failed and refused to sign and abide by a negotiated collective-bargaining agreement, the Board has traditionally ordered that the contract be applied retroactively and has granted a make-whole remedy for loss of pay and other benefits provided under the contract. See, e.g., Western Pacific Roofing Corporation, 244 NLRB 501 (1979), enf'd. sub nom. Seattle Auto Glass v. N.L.R.B., 699 F.2d 1332 (9th Cir.1982); J & L Painting Contractors, Inc., 239 NLRB 867 (1978); Rockwell Printing and Publishing Co. Inc. d/b/a Monument Printing Co., 231 NLRB 1215 (1977); Unelko Corporation, 195 NLRB 236 (1972), enf'd. 478 F.2d 1404 (7th Cir.1973); Tulsa Sheet Metal Works, Inc., 149 NLRB 1487 (1964), enfd. 367 F.2d 55 (10th Cir.1966). See also N.L.R.B. v. Strong, d/b/a Strong Roofing & Insulating Co., 393 U.S. 357 [89 S.Ct. 541, 21 L.Ed.2d 546] (1969). Such a make-whole remedy, which is designed to restore the status quo ante, enforces a public right.
 
 
 56
 Id. at 1331.
 
 
 57
 Absent some explanation for doing so, the Board cannot impose different remedies in similar situations. See National Treasury Employees Union v. Federal Labor Relations Authority, 732 F.2d 703, 705 (9th Cir.1984); Sheet Metal Workers' International Association, Local No. 355 v. NLRB, 716 F.2d 1249, 1257 (9th Cir.1983). The Board has offered no explanation for its departure from its traditional rule here, and we can find none.
 
 
 58
 If an employer is bound by negotiations conducted on his behalf and therefore must comply with the contract, absent unusual circumstances, he should be ordered to comply with the whole contract, not merely portions of it. The Yellow Book provided that wage rates and benefit contributions were effective beginning April 1, 1981. If the employer is not ordered to pay make-whole relief for the entire period of the contract then the status quo has not been restored, and the employer is treated in a manner different from other employers in the unit and receives a windfall for the violation, while the employees suffer an injury.
 
 
 59
 On appeal, the Board argues that "Dependable could not have been in violation of its duty to abide by the Yellow Book at any ... date [before November 15, 1981] because the agreement did not exist." But that is a mere truism, and it fails to explain why Dependable, unlike other employers who signed the Yellow Book, should not be bound to all the obligations imposed by the agreement, including the obligation to pay higher wages and benefits retroactively.
 
 
 60
 We conclude that the NLRB abused its discretion in not commencing the period of make-whole recovery against Dependable as of April 1, 1981, and that the Board's order should be modified accordingly.
 
 F. The Complaint Against Reliable
 
 61
 The General Counsel's complaint charged that Reliable had committed an unfair labor practice by "refusing to abide by the collective-bargaining agreement" between the Union and the Association. At the hearing before the ALJ, the General Counsel presented evidence that the Union had sent a letter to Reliable demanding compliance with the Yellow Book and stating, "If we do not hear from you on February 1, next, we shall assume that you do not intend to comply and will proceed accordingly." The General Counsel also presented evidence that Reliable did not respond to this letter. This was the only evidence introduced against Reliable, and the Board held that it was insufficient to support the complaint. We agree.
 
 
 62
 The General Counsel presented no affirmative evidence that Reliable refused to comply with the Yellow Book agreement. Such evidence, if it existed, obviously was available, e.g., Union records showing that Reliable had failed to make fringe benefit payments or testimony by Reliable employees that they had not been receiving the wages or benefits provided in the contract. Reliable's failure to respond to the Union's letter does not show noncompliance with the contract, and that was the only charge made in the complaint.[15] The Board's dismissal of the complaint against Reliable is supported by the record.
 
 III. CONCLUSION
 
 63
 The Board's conclusion that Dependable nullified its withdrawal from the Association is supported by substantial evidence. We enforce the Board's order against Dependable, modified to extend make-whole relief back to April 1, 1981, the inception date of the contract. We affirm the Board's dismissal of the complaint against Reliable for insufficient evidence.
 
 
 64
 ORDER ENFORCED AS MODIFIED.
 
 
 65
 CHOY, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 66
 I concur as to affirming the Board's dismissal of the complaint against Reliable. I respectfully dissent, however, as to enforcing the Board's order against Dependable.
 
 
 67
 The majority affirms the Board's finding that Hartman committed an unfair labor practice because he completed his term as a negotiator for the Association under the then current contract after he notified the Union that he would not be bound by any agreement between the Association and the Union after the contract expired unless he personally signed the new agreement. I do not find anything in the record that supports the Board's finding that Hartman acted unfairly.[1]
 
 
 68
 The Board found that Dependable's advance notice of withdrawal was timely and unequivocal when given. The notice said that after March 31, 1981, the expiration date of the then existing contract, Dependable would not be bound by any agreement between the Union and the Association unless Hartman personally signed the agreement. Hartman did not sign any new agreement. The Board, however, found that Dependable nullified its withdrawal notice because Hartman remained on the Association's negotiation committee until the expiration date.
 
 
 69
 The act of sending advance notice of withdrawal did not strip Dependable or Hartman of their rights and duties under the then existing agreements; a different holding would eliminate the "advance" notice. Hartman was performing the duties of his office as an Association negotiator diligently until his term ended on March 31, 1981.[2] He did not attend any Union/Association meeting after the original contract expired. Hartman's conduct was not inconsistent with Dependable's withdrawal notice.
 
 
 70
 The majority cites NLRB v. Associated Shower Door Co., Inc., 512 F.2d 230 (9th Cir.1975), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975), and Michael J. Bollinger Co., 252 N.L.R.B. 406, enforced mem., 705 F.2d 444 (4th Cir.1983), to support its holding. Associated Shower and Michael J. Bollinger Co. are inapposite. In each of those cases, an employer withdrew immediately. Here, Dependable sent the Union unequivocal advance notice of withdrawal to be effective on a future day certain. The Union knew that Dependable was not going to be bound by any agreement unless Hartman personally signed the agreement. The Union therefore "[knew] with whom they [were] bargaining and who [would] be bound by any agreement that [was] reached."[3]
 
 
 71
 It then became incumbent upon the Union to protest Hartman's presence when the Union and Association discussed the new agreement. The Union, if it so desired, could have refused to bargain with the Association if the Association insisted upon Hartman's presence. See Charles D. Bonnano Linen Service v. NLRB 454 U.S. 404, 420, 102 S.Ct. 720, 729, 70 L.Ed.2d 656 (1982) (Stevens, J., concurring).
 
 
 72
 I would not enforce the Board order against Dependable.
 
 
 
 [1]
 The notice Hartman sent to the Union stated:
 The present working agreement and contract now in force between Tile Layers Local # 19 of the B.A.C. and Associated Tile Contractors of Northern California, Inc. will expire as of midnight March 31, 1981.
 We of Dependable Tile Company are therefore informing Local # 19 that upon expiration of said agreement we no longer will have any part of said working agreement binding on Dependable Tile Company or its owners and therefore consider said working agreement null and void at that time.
 In addition, Dependable Tile Company and or its owners will not recognize an agreement or contract entered into between any organization or person with Tile Layers Local # 19 unless such agreement or contract is singed [sic] persorally [sic] by Jack E. Hartman of Dependable Tile Company.
 Thank you for your attention in this matter. This notice is given 90 days prior to expiration of current contract.
 
 
 [2]
 The interim agreements established temporary wage rates and fringe benefit contributions for the period from April 1 to September 1, "or until [the Union] concludes negotiations on a new agreement...."
 
 
 [3]
 Section 10(b) provides in relevant part that:
 no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made....
 29 U.S.C. Sec. 160(b) (1982).
 
 
 [4]
 Only General Marine Transport Co. v. NLRB, 619 F.2d 180 (2d Cir.1980), supports Dependable's position. In NLRB v. Preston H. Haskell Co., 616 F.2d 136 (5th Cir.1980), the panel filed three separate opinions, and two of those opinions expressly reject the argument Dependable makes here. See id. at 142-43 (Thornberry, J., concurring), 144-45 (Hatchett, J., dissenting)
 
 
 [5]
 Moreover, Dependable's attempt to withdraw from the Association was equivocal, see supra Part II.B, and substantial evidence supports the Board's conclusion that the Union did not acquiesce in Dependable's attempt to withdraw. The employer's repudiations in Strong were clear and unequivocal. See 386 F.2d at 931. An equivocal repudiation does not start the section 10(b) period running. See NLRB v. R.O. Pyle Roofing Co., 560 F.2d 1370, 1372 (9th Cir.1977) (per curiam)
 
 
 [6]
 In Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), a subsequent case, the Supreme Court held that a bargaining impasse does not justify an employer's unilateral withdrawal from a multi-employer bargaining unit and that such a withdrawal is an unfair labor practice
 
 
 [7]
 Justice Stevens wrote:
 The Court's holding does not preclude an employer from explicitly conditioning its participation in group bargaining on any special terms of its own design. Presumably, an employer could refuse to participate in multi-employer bargaining unless the union accepted the employer's right to withdraw from the bargaining unit should an impasse develop. The union or the members of the bargaining unit of course may reject such a condition; in such a case, however, the employer simply would be forced to choose between agreeing to be bound by the terms of group negotiation without a right of withdrawal at impasse, or foregoing the advantages of multi-employer bargaining and bargaining on its own.
 454 U.S. at 420, 102 S.Ct. at 729 (Stevens, J., concurring).
 
 
 [8]
 Dependable asserts that the Board's conclusion in this case is inconsistent with its recent decision in Walt's Broiler, 270 N.L.R.B. 556 (1984). We disagree. That case illustrates an "unequivocal" withdrawal
 In Walt's Broiler, the members of a multi-employer unit informed the union before negotiations for a new contract began that they were withdrawing from the unit and that they had hired the management consultant who had represented the unit to do their bargaining. The consultant made it clear during negotiations that he was representing the employers individually and was seeking a base contract from which their individual contracts could be fashioned. On a number of occasions, the negotiations and proposals were addressed to specific concerns of individual employers. The Board found that the employers had clearly and unequivocally withdrawn from the multi-employer unit. 270 N.L.R.B. at 557.
 By contrast, neither Hartman nor the other members of the Association's bargaining committee ever suggested in any way that they were not negotiating for the Association.
 
 
 [9]
 In other words, it was a true interim agreement, one that was intended to be permanent, and so Union's negotiation of it constituted consent to withdrawal)
 
 
 [10]
 Six other employers submitted untimely withdrawals after negotiations began. Because these withdrawals were ineffective, we count these employers in the unit for purposes of considering whether it later became fragmented
 
 
 [11]
 Six of these eight, employing thirty-five employees, were bound by the negotiations. The other two had timely withdrawn and thus were not bound
 
 
 [12]
 The Union initially contended during negotiations that the Sacramento Association was bound to the Brown Book just as it had been bound to the Blue Book. Based on this position, the Union included a list of Association members in the Brown Book. The Brown Book itself was conditioned on an agreement having been reached between the Union and the Association. And when the separate Yellow Book agreement eventually was finalized, the list of members of the Sacramento Association was transferred to it from the Brown Book and the six contractors that had signed the Brown Book then signed the Yellow Book instead
 Arguably this conduct could be construed as evidence that these employers had entered into separate permanent agreements with the Union. However, in light of the subsequent transfer of their signatures to the Yellow Book, it is more likely that the agreement was conditional--i.e., the employers would transfer to the Association agreement when negotiated.
 
 
 [13]
 Dependable also contends that it had delegated to the Association authority to bargain only along with the Bay Area Association and that when the Union agreed to separate negotiations and a separate agreement, a new employer bargaining unit was formed to which Dependable had not consented
 We find this argument utterly meritless. The September 1981 negotiations were not in a new bargaining unit; the Sacramento Association had always been separate from the Bay Area Association, and it continued to be throughout the 1981 negotiations. The fact that the Sacramento Association eventually obtained a separate agreement did not change the bargaining unit, but merely represented a concession to the Association, a concession for which Dependable and Hartman had long fought. The fact that Hartman participated in negotiations after the time when the Union agreed to consider separate contracts and the fact that Hartman stridently advocated separate contracts indicates that he consented to negotiations between the Union and the Association, without the presence of the Bay Area Association.
 
 
 [14]
 The Board's remedial authority is set forth in section 10(c) of the Act, 29 U.S.C. Sec. 160(c) (1982), which provides that the Board may order a violator "to cease and desist from such unfair labor practices, and to take such affirmative action, including reinstatement of employees with or without backpay, as will effectuate the policies of the Act."
 
 
 [15]
 We decline the Union's invitation to hold that the refusal to execute the Yellow Book agreement itself constitutes an unfair labor practice. The complaint alleged a failure to "abide" by the agreement, not a failure to execute it. Although actions before the NLRB are not subject to technical pleading requirements, Industrial, Technical & Professional Employees Division, National Maritime Union of America v. NLRB, 683 F.2d 305, 307-08 (9th Cir.1982), the record does not show that the argument the Union raises now was ever raised before the ALJ or the Board. Under these circumstances, we decline to consider for the first time on appeal whether Reliable's refusal to execute the agreement was itself an unfair labor practice. See Idaho Falls Consolidated Hospitals, Inc. v. NLRB, 731 F.2d 1384, 1386 (9th Cir.1984)
 
 
 [1]
 Whether Hartman's act constituted an unfair labor practice is a mixed question of law and fact. See United States v. McConney, 728 F.2d 1195, 1200, 1202 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Great weight is given to the Board's finding on a mixed question which is within the Board's expertise. Salt River Valley Water Users' Assn. v. NLRB, 769 F.2d 639, 642 (9th Cir.1985). The Board's finding of fact is conclusive if it is supported by substantial evidence. 29 U.S.C. Sec. 160(e). The reviewing court, however, cannot uphold the Board's finding if it is erroneous. See NLRB v. Brown, 380 U.S. 278, 291-92, 85 S.Ct. 980, 988-89, 13 L.Ed.2d 839 (1965); Sida of Hawaii, Inc. v. NLRB, 512 F.2d 354, 357 (9th Cir.1975)
 
 
 [2]
 On December 31, 1980, Hartman notified the Association that Dependable would not be a part of the Association after March 1981. His notice said:
 This is to inform you that [as] of March 31, 1981 Dependable Tile Company and its officers will resign from your organization. Therefore, as of 11:59 PM of March 31, 1981, we will no longer be associated with your orgnaization [sic] or with any agreements, contracts, or dealing you have with Tile Layers Local # 19, its officers or anyone else representing us.
 This notice given 90 days prior to expiration of current contract....
 (emphasis added).
 
 
 [3]
 The majority emphasizes that all of the Association's negotiators had withdrawn from the Association by January 1981, and implies that the Association would not have non-members negotiate for it. The majority's implication is unfounded. Associations do use non-members to negotiate for it. See, e.g., Walt's Broiler, 270 NLRB No. 99, 116 LRRM 1126 (1984) (employers not bound by a contract negotiated for an association by a hired, non-member representative, even though the employers were members of the association)